(No. 21358.—

HARRY H. GRAHAM *et al.* Appellees, *vs.* KATE F. O'CONNOR, Appellant.

*Opinion filed October 22, 1932.*

CHARLES H. LINSCOTT, and GARRETT & FELL, for appellant.

LARGE & RENO, and JAMES BERRY, for appellees.

Mr. JUSTICE ORR delivered the opinion of the court:

As a result of proceedings had under a bill in chancery therein filed in 1931 by the appellees, Harry H. Graham and Jesse D. Graham, (herein called complainants,) the circuit court of Winnebago county entered a decree quieting title to 122 acres of farm land in that county. From that decree the present appeal was taken by Kate F. O'Connor, (herein called defendant,) who claims title to about 15 acres of the land involved.

The defendant derived her title through *mesne* conveyances and by descent from one who obtained title by a tax deed. Hugh Graham, the father of complainants, obtained title to the tract in question in 1879 by a warranty deed. By descent on the death of Hugh Graham, by will on the death of their mother, and by a conveyance, the complainants took title to the tract. The defendant secured her title by a tax deed in 1895 and by the payment of taxes on the tract for over thirty-five years. In March, 1926, after the death of Hugh Graham, she filed her bill in the circuit court of Winnebago county seeking to quiet the title to the 15-acre tract now in dispute. In her action she saw fit to name among the defendants to her suit the "unknown

widow, heirs-at-law, legatees and devisees of Hugh Graham, deceased." On the same day she filed her affidavit, setting forth, among other things, that she was unable, after she had made "diligent search and due inquiry," to ascertain the proper names and places of residence of the defendants the "unknown widow, heirs-at-law, legatees and devisees of Hugh Graham, deceased," and "that on due inquiry the above named defendants cannot be found and that upon diligent inquiry the place of residence of said above named defendants cannot be ascertained." Again, at the same time she made another affidavit, to the effect "that the names and addresses of unknown widow, heirs-at-law, legatees and devisees of Hugh Graham, deceased, * * * are each and all unknown to this affiant; that this affiant has been unable, after diligent search and due inquiry, to learn the proper names of the parties heretofore described or their addresses; that this affiant, as complainant herein, is desirous of making said parties defendants to the above named bill of complaint for the purpose of quieting the title to the above described premises, and that this affidavit is made for the purpose of causing process to issue against all of said parties by the name and description given as aforesaid as well as for the purpose of giving notice by publication, as required by the statutes of the State of Illinois." In April, 1926, the defendant secured a decree in that proceeding quieting title to the 15-acre tract in herself.

The complainants alleged in their bill that the action brought by the defendant to quiet title in herself was without lawful force or effect, inasmuch as the defendant in her action had filed false affidavits in respect to the unknown widow, heirs-at-law, legatees and devisees of Hugh Graham, deceased. They said that when the defendant secured her tax conveyance they were in the open, notorious, exclusive and adverse possession of the tract, and being so, process was never served upon them by virtue of the defendant's bill, and that they had no knowledge of her action prior

to the filing of the final decree in her case. The defendant in her answer to their bill denied the falsity of her affidavits.

The defendant contends that since her suit to quiet title to the tract was determined in her favor the complainants are barred from bringing their action to quiet the title to the same land. Under the circumstances in the present case this contention is without merit. It must be remembered that in the defendant's suit the jurisdiction of the lower court over the complainants was based upon service by publication upon the "unknown widow, heirs-at-law, legatees and devisees of Hugh Graham, deceased." The constructive service thus obtained by publication was solely predicated upon the affidavits of the defendant that the widow, heirs-at-law, legatees and devisees of Hugh Graham, deceased, were unknown to her after she had made "diligent search and due inquiry" to ascertain the proper names and places of residence of that particular class of persons. Section 7 of our Chancery act (Cahill's Stat. 1931, chap. 22, par. 7,) provides that in all suits in chancery and suits to obtain title to lands, if there be persons interested in the same whose names are unknown, such persons shall lawfully be made parties to the suit by the name and description of unknown owners, or unknown heirs or devisees of any deceased person who may have been interested in the subject matter of the suit previous to his or her death. The statute requires that the person desiring to make unknown persons parties shall file an affidavit stating that the names of such persons are unknown, and process shall then issue against such parties by the name and description given. That section of the statute created a particular class of defendants called "unknown parties." Section 43 of the same act makes all decrees, orders, judgments and proceedings binding and conclusive upon such class. Section 12 of the act also provides specifically just how service shall be had upon those unknown parties. It compels the complainant or her

attorney to file in the office of the clerk of the court wherein the proceeding is instituted, an affidavit showing that any defendant on due inquiry cannot be found, and that upon diligent inquiry being made the place of residence of a defendant cannot be ascertained. Thereupon the clerk shall cause publication of notice of the pendency of the suit to be made in a newspaper, one of the necessary parts of this notice being the names of the parties to the action.

At the time the defendant filed her verified bill of complaint and her affidavits Hugh Graham was dead. That she had knowledge of this fact is disclosed by the language of the bill and of the affidavits. Her testimony discloses that she was acquainted with Graham in his lifetime, had conversed with him over the telephone a short time before his death, and that she knew about his last illness. Her testimony further shows that she knew Graham died a resident of New Milford, in Winnebago county; that he owned land close to or adjoining the tract she now claims; that she was well acquainted with the vicinity of the Graham farm, had been on the Graham land, knew Graham had children and had talked with one (Jesse) about her claiming title to the tract in question. At the time she prepared her bill and made her affidavits certain instruments were on file in the office of the probate clerk of Winnebago county as part of the public records of that office. Those instruments pertained to the estate of Graham and included a petition for letters of administration, setting forth the names and addresses of the decedent's heirs-at-law, an order of heirship showing the names of his widow and heirs-at-law, and an inventory wherein it appears that the tract in question was inventoried as a part of Graham's estate.

To secure jurisdiction over unknown parties by constructive service through publication is a concession of the law to the hard circumstance of necessity. The statute is particular in enumerating the necessary steps. The phrases "due inquiry" and "diligent inquiry" in that statute are not

intended as useless phrases but are put there for a purpose. Those two phrases have a well understood meaning that cannot be reconciled with the taking of a chance or guessing that the names and addresses of unknown parties can not be ascertained. A perfunctory inquiry does not comply with the provisions of the statute. An honest and well directed effort must be made to ascertain the names and addresses of unknown parties. The inquiry must be as full as the circumstances of the particular situation will permit. In this case the evidence shows that the defendant was a real estate dealer and at the time she obtained her tax deed was employed in the office of the county clerk of Winnebago county. The record shows she is a person of more than average intelligence, and we are warranted in assuming that she understood the importance and relation of public records to land titles. It is clear that the defendant fell far short of making the "due inquiry" and "diligent inquiry" required by the statute. Consequently her affidavits did not speak the truth. It necessarily follows that the court did not acquire jurisdiction over the complainants by constructive service based upon false affidavits. So far as these complainants are concerned, all proceedings had in the defendant's action with relation to the land in question are null and void and do not foreclose the complainants from bringing their suit to quiet title. The decree so obtained may be set aside at any time thereafter on the discovery of fraud. (*Busby* v. *Maus,* 294 Ill. 401.) Section 19 of the Chancery act does not apply here, as it applies only to those cases where the court acquires jurisdiction, and where, as a matter of fact, unknown parties are properly made parties to the action.

The only oral evidence offered by the defendant in support of her claim was her own testimony. When she obtained her tax deed she visited the tract in an endeavor to ascertain its exact location. While so doing she met Hugh Graham and with his consent went over the property

and picked out the boundary, and it was south of the Graham land. She visited the property frequently—how often she could not say with any degree of certainty. To reach the land she related that she had to cross over adjoining land, and that sometimes she would come through the Graham farm, using a lane from the farmyard to the tract. She made little use of the land, using it as a sort of playground for girl scouts, her friends and artists. She testified that the tract was invisible from either the Graham farm houses or from the home of the adjoining land owner, Peterson. The Grahams, she admitted, used the tract for pasturing their stock—a use to which she never put the land. The tract was covered with timber, and on one visit she found a hired man of the Grahams cutting down a white oak tree and ordered him to stop. After a conversation with one of the Grahams, who she stated was the complainant Jesse D. Graham, she said she withdrew her objection to the man cutting the tree. She said she was convinced that the tree was on land owned by the Grahams and not on land owned by her. She said that Jesse told her at the time that her land "was down by the river." Little use was made by her of the Graham lane, and she could not say whether or not any of the Grahams had ever seen her upon the property during the last twenty years. She related no other instances of her attempts to exercise authority over the land.

In support of the complainants' contention of adverse possession, Harry H. Graham testified that he was born on the place and had been intimately acquainted with the farm, including the tract in question, for forty years. He said that the Graham farm comprised over 122 acres, including the tract in dispute; that this tract was a part of a pasture consisting of about 35 acres; that this pasture land, including the tract in question, had been used as such from the time when their father, Hugh, first purchased the land; that the whole farm is enclosed by a barbed wire

fence, there being a cross-fence separating the pasture from the cultivated land; that no cross-fence has ever separated the tract in question from the rest of the pasture land, and that in order to reach the tract in lot 19 from the road one must go through the Graham farmyard, through a gate and then down a lane. He said that no person had ever made a claim to the tract until the defendant made her claim. He saw her on the tract in 1926 and engaged her in conversation, the subject of which was the man cutting down the white oak tree. According to him she told how she had ordered the man to quit cutting, but that she had made a mistake, as the tree was not on lot 19 but on the Graham land. Jesse D. Graham, the other complainant, testified that he was fifty-one years old and had lived on the Graham farm during his entire lifetime, with the exception of one year, and remembered the farm affairs well for the last forty years. He told how he had erected a fence around the entire farm and kept it repaired, the defendant at no time keeping up any part of the fence. The south boundary, he said, runs along the Kishwaukee river, and all of lot 19 north of that river has been a part of the Graham pasture land as long as he could recollect, with no cross-fence of any kind running through the pasture land. He related how he had sent his man Nelson to cut timber in the pasture and how the defendant had stopped Nelson; that he talked with her on that occasion and she then claimed to own some land somewhere. He said this incident occurred about twelve years ago and since that time he had never heard from the defendant, nor had he ever seen her make any use of the lane at any time to get to the tract in dispute.

Berzillar Kennedy testified that for over fifty years he had lived a half mile east of the Graham farm, although for the last nineteen years he had lived in Rockford, visiting his farm four or five times a year. He said there were outside fences on three sides of the farm, and that he was

not familiar with the fence alleged to be along the Kishwaukee river. He stated that the land in dispute was not visible from the road which passes the Graham farm and his farm.

Levin Peterson, the owner of the farm adjoining the Graham farm on the east, testified that a fence had been in place between the two farms since 1889, and that a cross-fence along the river on the Graham land and a fence on the north side of the Graham land had been in place during that same length of time. He knew the Graham pasture land, and said it is all enclosed and runs clear to the Kishwaukee river from the cultivated land on the north. The Grahams, he related, kept up the fences around the pasture and pastured their stock in it; that no one made any use of the pasture land besides the Graham family, and on no occasion did he ever see the defendant make any use of the land, although he admitted that the tract was not visible from his place.

The record discloses that the tract in question was wildwood land located on the banks of a small river and so situated as to be practically inaccessible to the public except from the river. Under these circumstances it is not to be expected that proof of adverse possession can be made as clearly as if the land were easily accessible and under intensive cultivation. The evidence showed conclusively that the Graham family had kept the disputed tract enclosed with the lands comprising their farm for over forty years and that it had been actually used as a part of the same farm under a claim of title for fifty-one years. There is no question but that the tract was put to continuous use as a pasture by the Grahams without molestation by third persons claiming any right therein until the defendant appeared upon the scene with her tax deed.

Numerous other objections are made by the defendant. She objects to the bill of complaint, alleging it to be multifarious because, as alleged, it attacks the decree in her

suit to quiet title on the ground of fraud and joins there-
with separate matters and different parties not interested in
that decree. This objection lacks merit, as the suit insti-
tuted by the complainants was to quiet the title of the whole
Graham farm in them. To adopt the view of the defendant
would encourage the bringing of separate suits over ques-
tions which could, and should, be properly settled in one
action.

The defendant also questions the directions of the de-
cree, claiming them to be purely a finding of fact. The
objection is immaterial as we deem the decree sufficient,
although its concluding paragraph could have been more
precisely drawn by making the adjudication more definite
and dependent upon the findings embodied in the decree.

The defendant further states that the complainants do
not offer to do equity by offering to reimburse her for
all she paid out in taxes on the tract. This point is well
taken. Section 224 of chapter 120 (Cahill's Statutes 1931)
provides that "any judgment or decree of court, in law or
equity, setting aside any tax deed procured under this act,
or restoring the owner of same to possession, shall pro-
vide that the claimant shall pay to the party holding such
tax deed * * * all taxes and legal costs, as provided by
law," etc. Under this section it was the duty of the trial
court to require reimbursement to the defendant for all
moneys properly paid out by her in procuring her tax deed
and for taxes, interest and costs as provided therein.

In all other respects the decree of the circuit court is
affirmed, but for the purpose of reimbursing the defend-
ant the decree is reversed and the cause is remanded to that
court, with directions to ascertain and require the payment
of the proper amount to the defendant under the provi-
sions of section 224 last above mentioned.

*Reversed and remanded, with directions.*